## NICHOLS et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 9569.

Circuit Court of Appeals, Sixth Circuit.

April 5, 1944.

Raymond K. Dykema, of Detroit, Mich. (James H. Spencer and Paul R. Trigg, Jr., both of Detroit, Mich., on the brief), for petitioners.

Fred E. Youngman, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, A. F. Prescott, and Joseph M. Jones, all of Washington, D. C., on the brief), for respondent.

Before HICKS, MARTIN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Petitioners, husband and wife, hereinafter referred to as petitioner, appeal from a decision of the Tax Court, that they realized income on foreclosure of a mortgage. In its holding, the Tax Court sustained the claim of the Commissioner that the accrued interest, included in the bid on foreclosure, is the measure of the realized income to the mortgagee. On appeal, it is contended that, under Treasury Regulations, gain or loss, on foreclosure, is measured by the difference between the fair market value of the property foreclosed, and the cost to· the taxpayer, of his interest therein; and that, on application of such rule, petitioner realized no income, but sustained a loss.

The evidence disclosed that petitioner was owner of 68.413% of the vendor's interest in certain land which was being purchased on land contract by the Lagoona Beach Company. The total purchase price in the contract, dated September 10, 1924, was $390,000. Of this amount, the vendee paid $100,000. The balance was payable annually, in varying amounts—the entire amount to be paid by September 1, 1932. During 1925 and 1926, petitioner received $17,500 as his share of the payments made by the vendee.

In August, 1926, the vendors, including petitioner, and the vendee, Lagoona Beach Company, entered into a new transaction, substituting for the land contract, a deed to the Lagoona Company, with a mortgage back to the owners—the former vendors. The purchase price in this conveyance, was $440,000, with credit for previous payments under the land contract, of $135,000. This left a balance of $305,000, which was represented by promissory notes, payable in seven installments, secured by a mortgage in the principal amount of $305,000. No payments were ever made on the mortgage.

In December, 1929, and at all times thereafter, the Lagoona Beach Company was hopelessly insolvent. Its only property consisted of the mortgaged real estate. Its corporate charter was forfeited September 1, 1930, for failure to file annual reports and pay the necessary fees. Executions on various judgments against the company, were returned unsatisfied, and on February 10, 1930, its property was placed in the hands of a receiver. In July, 1930, the mortgagees, consisting of petitioner and his associates, instituted foreclosure proceedings.

In October, 1932, judgment was rendered, including a holding of personal liability on the part of the Lagoona Beach Company, in default of payment of which, the property was to be sold "to raise the amount decreed to be due the plaintiffs." Pursuant to court order, the property was sold at public sale on January 5, 1933, and bid in by the Union Guardian Trust Company, as trustee for the mortgagees, at a price of $435,000. This was the only bid submitted, and represented the amount due under the mortgage, without interest which had accrued subsequent to the decree. The total amount due on the property at that time, including principal and interest, was $454,754.72. A deficiency judgment against the mortgagor, for $19,754.72, was entered. No money was paid on the purchase at the foreclosure sale, the mortgagees merely surrendering their mortgage and mortgage notes in full satisfaction of the price that was bid. No collection has ever been made of any part of the deficiency judgment. After the six-months' redemption period, provided in the decree, the mortgagees took possession.

The adjusted cost to petitioner for his interest (64.413%) in the property, was $155,721.05. In his income tax return for 1933, which was made on the cash receipts and disbursements basis, he computed his adjusted cost at $155,815.71, and the fair market value of the property at the time of foreclosure, at $195,000—the value of his interest therein, being $133,405.35. The difference between the cost to petitioner and his interest in the property at the time of foreclosure—$22,410.36 —was claimed as a loss to petitioner on the transaction. Respondent determined that, on the transaction, petitioner had realized income in the amount of $139,326.53.

There was some issue as to the fair market value of the property at the time of foreclosure. Petitioner introduced testimony of several qualified real estate wit-

nesses that such value was not in excess of $105,000. This was undisputed. Petitioner also testified that in 1934, a year after the foreclosure sale, he and his associates had authorized the sale of the property at $150,000, but that they were unable to sell it at that price. They still hold the property. Petitioner, therefore, claims that the value of his share in the property, at the time of foreclosure, amounted to 68.413% of $105,000—or $71,833.65—and that the difference between the now stipulated cost to him, of $155,721.-05, and the value of his share therein at the time of foreclosure, was $83,887.40—which represents the amount of his loss in the transaction. The Tax Court, however, found that the value of the property, at the time of foreclosure, was $195,000, basing its conclusion on the fact that petitioner had returned it at this amount in his tax return for 1933. Petitioner's explanation of his return was that he was overly optimistic when he made the return and thought the property was then worth the amount he included in his return.

The main issue in the case arises from the controversy as to whether the amount bid at the foreclosure sale, or the fair market value of the property at that time, should be used in determining gain as income on the transaction. This depends upon whether the foreclosure should be viewed as an exchange or as equivalent to a cash sale for the amount represented by the bid on foreclosure.

Petitioner contends that the transaction should be governed by the Treasury Regulation, which provides that where a creditor buys in mortgaged property, loss or gain is realized, measured by the difference between the obligation which the debtor has applied to the purchase price, and the fair market value of the property at the time of foreclosure.[1]

Under the above Regulation, if the fair market value of the property be computed in accordance with petitioner's claim, at $105,000—and his share therein, at $71,-833.65—petitioner's loss would be $83,887.-40. If the fair market value be computed at $195,000 (as found by the Tax Court)— and petitioner's share therein, at $133,405.-35—petitioner would, under the Regulation, still show a loss of $22,315.70.

The Tax Court held that petitioner derived taxable income from the transaction, represented by his share of the accrued interest included in the decree of foreclosure, in the amount of $86,389.03. At the same time, the Tax Court held that petitioner had suffered a capital loss in the amount of $22,410.36, and limited deduction as net loss, to $2,000 in accordance with § 117(a)(2) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 524.

The bid of $435,000 on foreclosure represented the aggregate of: $305,000, the amount of the mortgage; $126,275.75, the accrued interest thereon; and $3,724.25, the taxes paid by the mortgagees.

In arriving at the conclusion that the petitioner had derived taxable income from the transaction, the Tax Court held that in computing income, the bid price controlled and disclosed income to petitioner, represented by $86,389.03, his share in the accrued interest included in the court's decree of foreclosure. The court further held that the Regulation controlled in computing capital loss, which was figured as

[1] Regulations 77, Article 193, promulgated under the Revenue Act of 1932:

Uncollectible Deficiency Upon Sale of Mortgaged or Pledged Property.—Where mortgaged or pledged property is lawfully sold (whether to the creditor or another purchaser) for less than the amount of the debt, and the mortgagee or pledgee ascertains that the portion of the indebtedness remaining unsatisfied after such sale is wholly or partially uncollectible, and charges it off, he may deduct such amount (to the extent that it constitutes capital or represents an item the income from which has been returned by him) as a bad debt for the taxable year in which it is ascertained to be wholly or partially worthless and charged off. In addition, where the creditor buys in the mortgaged or pledged property, loss or gain is realized measured by the difference between the amount of those obligations of the debtor which are applied to the purchase or bid price of the property (to the extent that such obligations constitute capital or represent an item the income from which has been returned by him) and the fair market value of the property. The fair market value of the property shall be presumed to be the amount for which it is bid in by the taxpayer in the absence of clear and convincing proof to the contrary. If the creditor subsequently sells the property so acquired, the basis for determining gain or loss is the fair market value of the property at the date of acquisition.

Accrued interest may be included as a part of the deduction only when it has previously been returned as income.

the difference between the petitioner's interest in $195,000, the fair market value of the property—or $133,405.35—and $155,721.05, the cost of his interest in the property.

The Tax Court, therefore, held that, on the transaction, petitioner was taxable on income of $86,389.03, and that he had suffered a capital loss of $22,315.70.

In declining to give effect to the Regulation, providing that loss or gain on foreclosure proceedings is to be measured by the difference between the cost to the taxpayer and the fair market value of the property foreclosed, the Tax Court relied, in its decision that income to the taxpayer, in such case, was to be measured by the difference in the bid price on foreclosure and the cost to the taxpayer, upon Helvering v. Midland Mut. Life Ins. Co., 300 U. S. 216, 57 S.Ct. 423, 426, 81 L.Ed. 612, 108 A.L.R. 436. In that case, it was held that, where a life insurance company bid the principal of its mortgage loan, plus accrued interest, at a foreclosure sale, and took over the property in satisfaction of the whole debt, without payment and repayment of any cash, it was taxable on such interest, as income received during the taxable year, even though the property, when so acquired, was worth less than the amount of the principal.

Petitioner insists the Midland case is inapplicable. One dissenting opinion of the Tax Court agreed with this contention, and held that, instead of realizing a gain, petitioner had suffered a loss. Another dissenting opinion held that the Midland case was applicable and controlling, but had been misapplied; that the Supreme Court had therein precluded the Tax Court from giving effect to the Regulation; and that there could be no justification for a straddle in applying the Midland case to the item of interest, and applying the Regulation to the debt itself. It may also be remarked that the Commissioner sought to apply the rule in the Midland case and arrived at a result, rejected in the opinion of the Tax Court, as well as in each of the dissenting opinions, on differing grounds.

The effect of these divergent views was that the Commissioner determined that petitioner realized income of $139,326.53, and suffered a capital loss of $7,529.40. The Tax Court found that petitioner had realized income of $86,389.03, and sustained a capital loss of $23,523.39. One dissenting opinion held that petitioner had no income, but sustained a loss of $83,887.40; while the other dissenting opinion held, in effect, that petitioner realized income of $141,875.50 and suffered no loss. As a matter of fact, the petitioner received no income, and suffered a loss of $83,887.40. These different results were based upon the various views and interpretations as to the applicability of the Midland case, and its command to use the bid price in determining income on foreclosures. Decision on this appeal must, in our opinion, rest on a determination whether or not the Midland case is here applicable and controlling.

In the Midland case, which involved taxation of the income of a life insurance company, Mr. Justice Brandeis observed that during the preceding fifteen years, the Revenue Acts had continued provisions limiting gross income to that received during the taxable year from interest, dividends, and rents; and that net income was ascertained by making prescribed deductions. It was pointed out that the general provisions of the Revenue Acts concerning capital gains and losses, and bad debts, are not applicable to life insurance companies. Further recital showed that the insurance company, in question, had issued instructions to its representatives, having charge of foreclosures, to bid on its behalf, such sums as would enable the company to realize no loss on account of its investment in case of redemption; and that the bids had been made pursuant to such instructions without regard to the then actual value of the property.

At the outset, in discussing the Midland case, it appears significant that there, in answer to the petitioner's argument that taxation is a practical matter and should be governed by realities, the court's reply was: "The 'reality' of the deal here involved would seem to be that respondent valued the protection of the higher redemption price as worth the discharge of the interest debt for which it might have obtained a judgment." The same could not be said of the case before us. There was no reality, here, that the petitioner and his associates could have valued the protection of the higher redemption price as worth the discharge of the interest, or debt. To speak of "protection" against a higher redemption price in this case, is not to speak of reality, but of unreality. There

was no reasonable hope—no hope, whatever,—that the mortgagor could have redeemed at any price. It had been insolvent for three years. Its charter had been forfeited for nonpayment of fees and failure to file reports. Its only property consisted of the real estate, which was in the hands of a receiver; and all of its property was covered by petitioner's mortgage. Executions of various judgments against the mortgagor had been returned unsatisfied. None of its creditors could squeeze a penny out of it.

It seems, moreover, that the theory upon which decision rested, in the Midland case, was that the mortgagee, even by a bid which did not yield payment of the mortgage and interest, could be considered to have received value equivalent to its bid —or, to state it in another way, that, eventually, the mortgagee could, as a result of its bid, have received value equivalent to its bid, by way of a deficiency judgment. For the court observed: "If the bid had been insufficient to yield full payment of the mortgage debt, principal, and interest, the company would have been entitled to a judgment for the deficiency."

No deficiency judgment against the mortgagor in the instant case could imply any partial satisfaction, or hope of satisfaction, of the debt or interest, because of the complete, protracted, and hopeless insolvency of the mortgagor. As a matter of fact, a deficiency judgment was entered; but it was no more than a formal routine proceeding and no one could have had any thought that it would ever possibly have been satisfied in any degree.

A further ground of distinction between the two cases may be seen in the observation made in the Midland case: "If the company had refrained from bidding, and a stranger had bid more than the principal, the company would obviously have been taxable upon the excess up to the amount of interest due. Perhaps, it was the company's custom of bidding the full amount of principal and interest which deterred bidding by others." Id., 300 U.S. at page 226, 57 S.Ct. at page 427, 81 L.Ed. 612, 108 A.L.R. 436.

In the instant case, it is safe to say that if petitioner and his associates had refrained from bidding, there would have been no bid whatever. There was no custom, on the part of these mortgagees, to bid the full amount of principal and interest. They were engaged in a kind of joint venture in a single piece of property, and this venture was the principal business of petitioner. There was no known practice on the part of the mortgagees that would have deterred bidding by others. Without the inclusion of any interest, the principal amount due on the mortgage was $305,000. The fair market value of the property, from all available and credible evidence, was then $105,000. The year following the foreclosure—a year in which property values were higher than in the depths of the depression year of 1932—the property could not be sold for $150,000. The Tax Court found the value at the time of foreclosure, to have been $195,000, by taking the figure at which petitioner had optimistically set forth such value in his tax return for 1933. But this amount was $110,000 less than the unpaid balance. In this case, it is incredible to suppose that a stranger might have bid more than the principal; for if he had bid only the principal amount of the mortgage, he would have immediately been out $110,000, even on the basis of accepting the high figure for fair market value as found by the Tax Court; and if the fair market value were considered at $105,000, according to uncontradicted testimony, such a bidder would forthwith have suffered a loss of $200,000. The foregoing emphasizes the fact that the court, in the Midland case, disregarded the claimed evidence of fair market value, apparently, because of procedural objections and because such evidence had not been made a part of the record.

Under the above circumstances, it seems obvious that the Supreme Court, in the Midland case, contemplated that foreclosure on the bid, in that case, implied the receipt by the mortgagee, of value of something or of some nature, that could be considered as equivalent to the amount of the bid. Such a basis for holding that the bid on foreclosure should be taken to represent the receipt of value equivalent to the bid, is absent from this case.

Perhaps, the most important distinction sought to be drawn by petitioner between the Midland case and the case at bar, is that the Midland case involved a life insurance company. In its opinion in that case, the court said:

"Where the legal effect of a transaction fits the plain letter of the statute, the tax is held payable, unless there is clearly revealed in the act itself or in its history a definite intention to exclude such trans-

actions from the operation of its applicable language (citing cases). Respondent here makes no such showing."

The statute before the court was § 202 of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 546, relating to gross income of life insurance companies. The statutory provision before the court in the instant case, is § 22(a) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 487, embodying the general provisions respecting gross income.

■ If the legal effect of the foreclosure transaction in this case could be said to fit the plain letter of the statute, the history of the Act shows the intention to exclude the transaction, with which we are here concerned, from such language. For the Act, from its history, must be considered as enmeshed with the Regulation. Since 1926, the Treasury Regulations have repeatedly classified a transaction of the type here involved, as an exchange of mortgage notes for land. They do not apply to life insurance companies, for the subject of the Regulations is gains and losses, and bad debt deductions, having no application to life insurance companies.

In the Midland case, the Regulation was not before the court, obviously, because it was not applicable to § 202 of the Revenue Act of 1932, there involved; and the court did not pass upon its validity, or make any mention of it. The opinion, in that case, in spite of certain broad language used, is not authority for holding the Regulation invalid here.

In Hadley Falls Trust Co. v. United States, 1 Cir., 110 F.2d 887, where a corporate mortgagee sought recovery back of income taxes on the ground that a mortgage foreclosure had resulted in a deductible loss, it was held that Article 193 of Treasury Regulations 77, was applicable, and that the loss should be computed on the basis that the fair market value of the property foreclosed—rather than the bid price—was determinative of what the mortgagee had received. The court remarked that, in the absence of any regulation, it would be doubtful whether the taxpayer's claim for a deduction respecting the foreclosure could be upheld in view of the Midland case. But it was observed:

"We do not find in Helvering v. Midland Mut. Life Ins. Co., supra, anything requiring a different conclusion. The only question before the court in that case was whether an insurance company should include in its gross income, as interest, the amount of interest included in the bid price for real estate acquired by it at foreclosure sale, the fair market value being less than the bid price. The court held that the interest was taxable income.

"We do not see how this holding sheds any light on the question of authority of the Commissioner to provide by regulation for the ascertainment of gain or loss in those cases within the reach of Regulation 193. In the case of Helvering v. Midland Mut. Life Ins. Co., supra, the court was not dealing with the validity or applicability of any regulation similar to Regulation 193." Id., 110 F.2d at page 892.

In the case at bar, the Commissioner urges that the broad statements of the court, in the Midland case, are applicable to computation of income on foreclosures, whether the mortgagee be an insurance company or an ordinary business corporation. The language therein, to be sure, is not specifically limited in its scope. But when the same contention was urged in the Hadley Falls case, the Circuit Court of Appeals of the First Circuit declined assent to such a proposition. In commenting upon the language used in the Midland case, to the effect that the petitioner's claim therein ignored the need of an efficient system of taxation, and that "the administration of the income tax law would be seriously burdened if it were held that when a mortgagee bids in the property for a sum including unpaid interest, he may not be taxed on the interest received except on an inquiry into the fair market value of the property," the court, in the Hadley Falls case, said:

"Although the language of the court is very broad, we cannot believe that it was intended to preclude examination into the fair market value of property under all circumstances, especially in a case where the agency required to engage in the process of valuation, viz., the Treasury Department, has itself been responsible for the rule making valuation necessary." Id.

By such pronouncement was it determined that the general statements, in the Midland case, were not controlling in a controversy to which the Regulation, here in question, was applicable.

With regard to the application of the Regulation, the court, in the above case, said: "Upon reenactment of the statute without change, such a regulation should

be given the force and effect of law. Surely if the Supreme Court had been faced, in the Midland Mutual case, with a statutory provision making determination of the fair market value necessary, it would not have disregarded such a mandate. Similarly, we are faced here with a regulation which has become imbedded in the statute." Id.

■■ The statutory provision in question, § 22, is so general as to render an interpretative regulation appropriate. The Regulation is reasonably adapted to the administration of the Act; and since 1926, while it has remained substantially unchanged, the pertinent provisions of the Revenue Act have been repeatedly re-enacted, in the face of the construction so placed upon them by the Commissioner. "It is already familiar doctrine that a regulation interpreting a provision of the revenue laws is deemed, upon subsequent re-enactment of the provision without substantial alteration, to have received legislative ratification and thereby to have been given the force and effect of law." Id., 110 F.2d at page 891.

In view of the application of the Regulation, in question, to mortgage foreclosures, for many years past, and considering the conclusion of the Tax Court that it would be applicable to the transaction here involved, if it were not contrary to the Midland case, we are of the opinion that the legislative branch intended, in view of its repeated re-enactments of the statute, that it was to be construed and understood in accordance with the settled construction placed upon it by the enforcement officials as disclosed by the pertinent Regulation. Under such circumstances, the Regulation is to be given the same force and effect as the statute, itself.

■ Counsel for the Commissioner contend that, while the Hadley case properly determined that the Regulation was applicable to computation of capital gain and loss, where the bid on foreclosure embraced only the principal of the debt, it did not apply in computing income when the bid included accrued interest; and that the Midland case, while not applicable in computing capital gain and loss, controlled in computing income where accrued interest was included in the bid price, for the reason that interest is income.

It is true that the bid in the Hadley case did not include accrued interest, but we fail to see where that makes any difference. The Regulation is based upon the theory that the mortgagee exchanges the obligations of the debtor and receives the fair market value of the property. The obligations may embrace interest included in the bid on foreclosure. Under the Regulation, the mortgagee receives, on the exchange, nothing more than the fair market value of the property foreclosed. If that is all that he receives on the exchange, he cannot be said to have also realized accrued interest embraced in the bid; and there is nothing additional left for taxation. We are, therefore, of the opinion that the Midland case is not here in point, and agree with petitioner that the Regulation is applicable and controlling in this controversy.

■ The reality of the deal here involved, to paraphrase the Midland case, is that petitioner paid $155,721.05, in cash, for property which, on foreclosure, was actually worth $71,833.65. On the transaction, he realized no gain; but lost $83,887.-40. On the same transaction in which he suffered this loss of $83,887.40, he was taxed on income of $86,389.03. The income was imaginary. Petitioner realized no income.

The decision of the Tax Court of the United States is reversed and the case remanded for further proceedings in accordance with this opinion.